# Toledo v. Medical Engineering Corp.

C.P. of Philadelphia County, April Term 1992, no. 136.

*John P. Kopesky,* for plaintiffs.
*Daniel F. Ryan III,* for defendant Mitra.
*Therese M. Keeley,* for defendant Medical Engineering Corp.
*C. James Zeszutec,* for defendant Minnesota Mining & Manufacturing Co.
*Madeline M. Sherry,* for defendant Baxter Healthcare Corp.

WETTICK, *J.,* December 29, 2000—Through a March 17, 1993 order of court, the Supreme Court of Pennsylvania appointed a three-judge panel (coordinating court) to manage and coordinate the large number of cases filed (and likely to be filed in the future) in the common pleas courts of this state in which the plaintiffs were seeking damages for personal injuries alleged to have been sustained in the use of silicone breast implants. Most of the Pennsylvania state court cases involved claims raised against both the implant manufacturers and the health care providers.

At this same time, there were pending in the federal courts a large number of cases in which persons allegedly injured in the use of silicone breast implants were suing only the manufacturers. These cases were assigned to Honorable Sam C. Pointer Jr. of the Northern District of Alabama (*In re Silicone Gel Breast Implants Products Liability Litigation* (MDL-926)).

In the Pennsylvania state court proceedings, the coordinating court initially stayed case-specific discovery while settlement discussions were pending in the MDL. In 1998, the coordinating court began issuing court orders lifting the stay for cases selected by plaintiffs' counsel on the Steering Committee.

Most of the plaintiffs with pending Pennsylvania state court cases did not opt out of the federal court settlement. Consequently, in the vast majority of the Pennsylvania state court cases, the plaintiffs are proceeding only against the health care providers.

The present case has been identified by the Steering Committee members as the first state court silicone implant case that will proceed to trial. Discovery has been completed and the parties have filed their pretrial statements.

The only significant pretrial issue that remains is a *Frye* motion filed by defendant that seeks to restrict the testimony that plaintiffs' experts wish to offer.[1] This *Frye* motion is the subject of this opinion and order of court. The issue raised by the *Frye* motion is whether plaintiffs may offer testimony that silicone gel causes localized pain.

---

1. *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).

## I. FACTUAL BACKGROUND

Plaintiff-wife elected to undergo breast reconstruction with the implantation of silicone gel breast implants. She has sued the surgeon because of injuries which the implants allegedly caused.

The initial surgery was performed by Dr. Mitra on September 2, 1986. The brief of plaintiffs, Re Admissibility of scientific evidence at 3-7, describes the testimony that plaintiff will offer concerning the events occurring after the September 2, 1986 surgery:

"Approximately one week post-implantation, Ms. Toledo presented at the Temple University Hospital emergency room with complaints of pain and burning in the lateral aspect of the left breast. She was discharged with Tylenol no. 3. Ms. Toledo had subsequent emergency room visits at Temple University Hospital for breast pain in December 1986 and April 1987.

"Dr. Mitra had placed Ms. Toledo's implants under her pectoral muscles and, initially, Ms. Toledo experienced a 'heaviness' of her left implant; she also experienced the feeling that the left implant had 'dropped.' Within the first six to seven months following her implantations (*i.e.,* by May 1987), Ms. Toledo developed pain in the side of her left breast that radiated into the axilla, shoulder blade and into the arm.

"In response to the pain that had developed in Ms. Toledo's left breast, Dr. Mitra performed a scar revision in April 1987. She also developed pain in the right breast, and Dr. Mitra performed a scar revision on the right breast, together with the removal of a blood clot, or hematoma, in August 1988.

"Following the August 1988 scar revision surgery, Ms. Toledo had few complaints for about one year. From 1990, however, her problems increased. She developed a pain in the left scapula that radiated down the arm. This would last from a few minutes to hours each time. Her left hand would feel like it was swollen, the hand would become painful and the pain would awaken her at night. Ms. Toledo was seen in the Northeastern Hospital Emergency Room in January 1990 for breast pain. A follow-up mammogram in April 1990 was read as negative.

"During the period from January to April 1992, her brassiere size increased two sizes. She had joint pain without swelling, particularly in the area of the left shoulder, and chest pains. She was chronically fatigued and slept poorly, waking up approximately five times per night due to breast and joint pain, and she would awaken unrefreshed in the morning.

"Ms. Toledo visited the emergency room of the Hospital of the University of Pennsylvania in April 1992. She subsequently saw Ralph Hamilton M.D., on April 2, 1992, for an aching pain in the left axilla to the arm. Ms. Toledo told Dr. Hamilton that, in the previous month, her right implant had decreased in size. Ms. Toledo also sought treatment from Harry W. Sharp D.O., her family physician. On the basis of the tests ordered by Dr. Sharp, it appears that he suspected some form of systemic illness. An ANA, TSH, RF, ASO, Lyme and anti-DNA were obtained. A TSH level was found to be elevated, and Ms. Toledo was placed on Synthroid, a thyroid hormone replacement. Ms. Toledo's symptoms, however, did not subside.

"Ms. Toledo was first seen by Bruce Freundlich M.D., a rheumatologist, on April 7, 1992. On physical examination, Dr. Freundlich noted the presence of several palpable small mobile cervical lymph nodes that were very tender. She also had axillary adenopathy. Her breasts were heavy. The right nipple was low compared to the left, producing an asymmetry. Both implants were encapsulated.

"Ms. Toledo then saw Mark P. Solomon M.D., a plastic and reconstructive surgeon, in April 1992. Her complaints at that time included swelling in her armpits, pain in the left breast and left arm, and bilateral loss of nipple sensation. On physical examination, Dr. Solomon noted that Ms. Toledo had bilateral capsular contractures with malpositioned implants. Ms. Toledo underwent a diagnostic ultrasound evaluation of the breast area. On ultrasound, both sides were abnormal, with the left side showing some abnormal echos.

"On June 16, 1992, Mark S. Granick M.D., another plastic and reconstructive surgeon then in practice with Dr. Solomon, performed bilateral prostheses explantations and capsulectomies along with a left axillary node biopsy. Findings at the time of the procedure were a ruptured left implant with free silicone gel contained within the capsule. Dr. Granick also reported a deformity of the chest wall underlying the region of the implants. This consisted of a hollowness of the ribs and abnormal curvature of the ribs consistent with the line of the encapsulated implants. Dr. Granick also noted the presence of a significant amount of residual breast parenchyma in the periareolar areas bilaterally.

"Postoperatively, Ms. Toledo recovered in a routine fashion and, in July 1992, Ms. Toledo reported to Dr. Granick that her condition had improved. The left implant was described as being 'very heavy' and, as soon as the implants were removed, Ms. Toledo experienced a decreased pressure on her rib cage. Ms. Toledo continued to experience this improvement in her symptoms for the first few months after the removal of her implants.

"In September 1992, however, she began to again experience pain in the left breast, arm and shoulder. She was once again fatigued, stiff and achy. By March 1993, during a revisit to Dr. Granick, Ms. Toledo once again complained of pain in the left side of the chest with 'numbness extending into the left neck.'

"Ms. Toledo returned to the care of Dr. Freundlich, the rheumatologist, on March 25, 1993. Dr. Freundlich's general physical examination at that time was unremarkable. Ms. Toledo returned to Dr. Freundlich one year later. She complained of an intermittent left-sided chest pain that was similar to the one she had when the implants were in place. This pain limited her ability to care for her children and do her housework. Dr. Freundlich's March 1994 examination revealed almost no breast tissue. The left medial upper region of the breast was tender. No adenopathy was detected."

## II. SUMMARY OF THE LAW

On December 22, 2000, in *Blum v. Merrell Dow Pharmaceuticals, Inc.,* no. 1 E.D. appeal docket 1999 (Pa. 2000), the Pennsylvania Supreme Court stated that the *Frye* rule continues to govern the admissibility of expert

scientific evidence in Pennsylvania: "The *Frye* rule bars novel scientific evidence until it has achieved 'general acceptance' in the relevant scientific community." *Id.* at 1.

*Blum* involved a *Frye* motion challenging the admissibility of causation testimony. However, because they found the testimony of the expert witness to be so flawed, the majority in Blum never addressed the issue of whether the *Frye* standard is satisfied if the methodologies by which the scientist reached his or her conclusions have been generally accepted in the scientific community or whether *Frye* requires that the conclusions of the scientist be generally accepted by the scientific community.

In the present case, I will reach the same result if the focus is on whether the causal relationship is generally accepted by the scientific community, if the focus is on whether the methodology is generally accepted by the scientific community, or if the focus is on the general acceptance of both the causal relationship and the methodology.

## III. DESCRIPTION OF PLAINTIFFS' CLAIMS

I will now discuss the complications that plaintiff experienced, which plaintiffs' expert witnesses wish to link to the silicone gel implants.[2]

Plaintiffs' counsel has limited plaintiffs' claims to the eleven items described below:[3]

---

2. Attached as exhibit 1 [not published here] is a glossary which defines many of the terms contained in this opinion. This glossary is appendix D to a report by the Institute of Medicine, *Safety of Silicone Breast Implants* (2000), described at pages 166-69 of this opinion.

3. See May 2, 2000 transcript of a pretrial conference at 7.

(1) Implant fibrous capsule—Pierre J.J.B. Blais Ph.D., Harris Busch M.D., Robert L. Cucin M.D., Bruce Freundlich M.D., Mark S. Granick M.D., Fredrick W. Hetzel Ph.D., Amitabha Mitra M.D., Saul Puszkin Ph.D., and H. Ralph Schumacher M.D.

(2) Gel implant rupture (intra- and extracapsular)—Harris Busch M.D., Robert L. Cucin M.D., Mark S. Granick M.D., and Fredrick W. Hetzel Ph.D.

(3) Explantation-related scarring and deformity—Robert L. Cucin M.D., Bruce Freundlich M.D., and Mark S. Granick M.D.

(4) Gel migration—Pierre J.J.B. Blais Ph.D., Harris Busch M.D., Robert L. Cucin M.D., Bruce Freundlich M.D., Mark S. Granick M.D., Fredrick W. Hetzel Ph.D., Saul Puszkin Ph.D., and H. Ralph Schumacher M.D.

(5) Axillary adenopathy—Pierre J.J.B. Blais Ph.D., Harris Busch M.D., Robert L. Cucin M.D., Bruce Freundlich M.D., Mark S. Granick M.D., Saul Puszkin M.D., and H. Ralph Schumacher M.D.

(6) Peri-implant hematoma or seroma—Robert L. Cucin M.D., Mark S. Granick M.D., Amitabha Mitra M.D.

(7) Swelling of the breasts—Robert L. Cucin M.D., Bruce Freundlich M.D., and Mark S. Granick M.D.

(8) Implant shifting or displacement—Robert L. Cucin M.D., Bruce Freundlich M.D., and Mark S. Granick M.D.

(9) Acute and chronic chest wall pain—Pierre J.J.B. Blais Ph.D., Harris Busch M.D., Robert L. Cucin M.D., Bruce Freundlich M.D., Mark S. Granick M.D., Saul Puszkin Ph.D., and H. Ralph Schumacher M.D.

(10) Loss or change in sensation of the breast or nipple—Robert L. Cucin M.D., Bruce Freundlich, M.D., and Mark S. Granick M.D.

(11) Chest wall skeletal changes—Mark S. Granick M.D.

Each item was discussed at the May 2, 2000 pretrial conference.

### Item 1—Implant Fibrous Capsule

Plaintiffs describe this item as a capsular contracture. When the implant is in place, a fibrosis capsule forms around the implant. (T. 7-8.)[3A] In this case, Ms. Toledo had a severe contraction of these capsules, creating pain in the area of her breasts. A contraction can cause a deformity of the breast. When the implant is taken out, the surrounding tissue capsule is also removed. When the contracted capsule is removed, the pain from that source will end. (T. 9-17.)

Defendant is not raising a *Frye* objection to this item.[4]

### Item 2—Gel Implant Rupture
### (Intra- and Extracapsular)

For this item, plaintiffs will be presenting testimony that gel implants rupture, that they ruptured in this case, that a rupture creates a cosmetic deformity, and that the silicone gel goes into the human body as a result of the rupture. Where the gel goes and what it does will be

---

3A. All page numbers cited as T. refer to the May 2, 2000 transcript. All page numbers cited as ST. refer to the September 19, 2000 transcript.

4. In this opinion, I am describing what plaintiffs seek to establish. Defendant is not necessarily conceding that plaintiff-wife is actually suffering the injuries which plaintiffs describe or that these injuries are related to her implants. Defendant is only stating that it will not be raising the issue that there is no scientific support for certain claims.

covered in other items. Defendant is not raising a *Frye* objection to this item. (T. 19-21.)

### Item 3—Explantation—Related Scarring and Deformity

This item is self-explanatory. Defendant is not raising a *Frye* objection to this item. (T. 21-22.)

### Item 4—Gel Migration

This item involves only a description of where the gel may travel. (The significance of the presence of the gel is covered in later items.) Plaintiffs seek to introduce testimony that the gel passed through the implant shell and capsule into the tissues of plaintiff's chest area and into the lymph nodes under the armpit (axillary lymph nodes). Defendant is not raising a *Frye* objection to this item. (T. 22-28.)

### Item 5—Axillary Adenopathy

This item refers to the condition of the lymph nodes described in item 4. Plaintiff's lymph nodes were swollen, painful, and tender. This condition disappeared after the lymph nodes were removed. Defendant is not raising a *Frye* objection to this item. (T. 28-30.)

### Item 6—Peri-Implant Hematoma or Seroma

This item refers to a blood or fluid clot that forms in and around the area of the implant. It requires surgical removal. It is painful until removal. The condition disappears after removal. Defendant is not raising a *Frye* objection to this item. (T. 30, 58.)

### Item 7—Swelling of the Breasts

This item will be discussed later.

### Item 8—Implant Shifting or Displacement

This item concerns appearance. Shifting or displacement is one of the reasons implants are removed. This item involves only the situation in which the implant is not in place. (T. 59-60.) Defendant is not raising a *Frye* objection to this item.

### Item 9—Acute and Chronic Chest Wall Pain

This item will be discussed later.

### Item 10—Loss or Change in Sensation of the Breast or Nipple

This item is self-explanatory. It is a permanent condition. It is plaintiffs' position that this is a result of nerve damage attributable to the surgeries, particularly the surgery to remove the implants. Defendant is not raising a *Frye* objection to this item. (T. 60-62.)

### Item 11—Chest Wall Skeletal Changes

Plaintiff has a bowed rib as a result of the size, weight, and placement of the implant. She will not be attributing any pain to this condition. It is not a condition that will require surgical correction. (T. 62-65). Defendant is not raising a *Frye* objection to this item.

## IV. SCOPE OF DEFENDANT'S *FRYE* MOTION

### Item 7—Swelling of the Breast and Item 9—Acute and Chronic Chest Wall Pain

Plaintiff will testify that she has swollen, painful, and tender breasts. (T. 31, 46.) She also has tenderness and

pain in the area of the chest. (T. 48) To this day, the pain is so severe that it affects her sleeping, her appetite, her relationships with her husband and children, and her ability to work. (T. 49-50.) One of her treating physicians will testify that during the removal of the implants, all of the silicone could not be removed. (T. 45.) Another observed the swelling of her breasts before and after the explantation. (T. 46.) Her breasts continue to be tender to touch. (T. 51-53.) She has continuing complaints of pain. (T. 51).

Defendant acknowledges that studies recognize that a woman may experience severe pain in the breasts and chest area prior to explantation because of capsular contracture. (T. 110-113.) According to defendant, (1) capsular contracture describes a body's reaction to the implant—not to the silicone—(2) capsular contracture can cause severe pain in some cases, and (3) pain attributable to capsular contracture disappears after the implant is removed. Consequently, defendant is not raising *Frye* objections to any testimony that attributes pain prior to explantation to capsular contracture as defined by defendant.

Defendant also acknowledges that studies recognize that after explantation a woman may experience pain that is attributable to the surgery. Consequently, defendant will not be raising any *Frye* objections to testimony linking pain to the operations in which the implants were implanted and removed. (T. 40).

Plaintiffs, however, seek to offer an additional explanation for the pain. Plaintiffs seek to offer expert witnesses who will testify that the pain is explained by the body's reaction to exposure to silicone. According to

these witnesses, there is a foreign body reaction which causes permanent pain. It is the body's response to the silicone that is the primary cause of the pain that plaintiff is experiencing. The pain is permanent.[5]

According to plaintiffs' brief, plaintiffs' expert witnesses wish to offer the following testimony: (1) there is gel migration either from gel bleed or rupture; (2) gel will migrate outside of the implant and capsule to other parts of the body, including the wall of the chest; (3) there is a foreign body reaction to this gel that can result in severe and persistent inflammatory responses characterized by chronic granulomatous inflammation; and (4) this bodily reaction results in adverse clinical and immunological manifestations, including persistent pain. (Plaintiffs' brief at 87-88.)

In his *Frye* motion, defendant does not challenge plaintiffs' contention that there are studies which support points 1, 2, and 3. The dispute is over whether bodily reactions to the silicone gel produce adverse clinical and immunological manifestations, including persistent pain.

Defendant recognizes that there are scientifically accepted studies that support a claim that the implantation and explantation of a breast implant may cause pain. During the period that the implants remain in the body, the body's response—the contracting of a capsule which forms around the implant—can explain the pain. After

---

5. The cause of any pain may be relevant to the issue of liability (as well as damages). Plaintiffs are raising a lack of informed consent claim against defendant. If defendant had warned against pain caused by scarring but not pain caused by the body's response to silicone, plaintiffs might prevail by showing that the pain is the result of this foreign body reaction.

removal, pain attributable to the reactions to the surgery may persist for several years. However, it is defendant's position that the presence of inflammation, by itself, does not imply that there will be local symptoms or systemic disease. Inflammation is a bodily response that walls out the foreign body. It is consistent with good health rather than indicative of any immunological reaction.[6] According to defendant, there is no scientifically accepted study which can link the inflammatory responses characterized by chronic granulomatous inflammation to the chest and breast pain about which plaintiff complains. Defendant's *Frye* motion is based on this assertion that there is no science which supports the testimony of plaintiffs' expert witnesses that silicone gel causes illness or pain.

The position of the defendant is set forth in the following June 1, 2000 declaration of Darryl Carter M.D.:

## DECLARATION OF DARRYL CARTER M.D.

"(1) My name is Darryl Carter. I am over 21 years of age, am of sound mind, have never been convicted of a felony, and am otherwise competent to make this affidavit.

"(2) I have personal knowledge of all factual statements contained in this declaration and all such factual

---

6. The definition section of the IOM study (appendix D which I have attached as attachment 1 to this opinion) [not published here] defines inflammation as a "[l]ocal tissue protective response to injury involving dilation of blood vessels, fluid exudation and migration of white cells" and *granuloma* as "[n]odular chronic inflammatory lesion, consisting of various cells such as mononuclear cells, epithelioid cells, giant cells, lymphocytes, eosinophils, and plasma cells."

statements are true and correct to the best of my knowledge, information and belief as outlined herein.

"(3) I am a professor of Pathology at Yale University Medical School and also am an attending pathologist at Yale-New Haven Hospital in the Surgical Pathology Department. My practice focuses on evaluating tissue from the breast and lung.

"(4) I graduated from Johns Hopkins University School of Medicine in Baltimore, Maryland, and did my internship and residency in general surgery at the University Hospital, Ohio State University in Columbus, Ohio. I returned to Johns Hopkins to do a residency in Pathology and thereafter did a fellowship at Memorial Sloan Kettering Hospital for Cancer and Allied Diseases. While at Memorial Hospital, I was also a senior clinical trainee for the Cancer Control Program of the U.S. Public Health Service. I am licensed to practice medicine in the states of Maryland and Connecticut, and am board certified in Anatomical Pathology.

"(5) Before coming to Yale and Yale-New Haven Hospital, I held similar positions at Johns Hopkins University School of Medicine and Johns Hopkins Hospital. I have been involved in research and have written over 100 articles in peer-reviewed medical and scientific journals focusing on diseases of the breast and lung. I also serve as a reviewer of submitted articles for such professional journals as *The American Journal of Surgical Pathology, The American Journal of Clinical Pathology, Modern Pathology, Diagnostic Molecular Pathology* and *The International Journal of Pathology* among others. I have authored several medical textbooks and have writ-

ten numerous chapters in medical textbooks of others in the field of Pathology. I have attached to my declaration, as exhibit 1, a current copy of my curriculum vitae to identify further my professional background. [Not published here.]

"(6) In connection with the breast implant litigation, I have consulted with a manufacturer of silicone gel-filled breast implants (SBIs) and given testimony as an expert witness in deposition, and in court on behalf of an SBI manufacturer. At the invitation of SBI manufacturers, I have also made a presentation to the Rule 706 National Science Panel before the Hon. Sam C. Pointer convened in the multi-district litigation of the breast implant litigation.

## I. *Tissue Response To Silicone Is Not Unique*

"(7) If the only experience with breast histology is the examination of capsules, then it is understandable how one may incorrectly assume that inflammation only occurs because of silicone. Experience with a broad range of mammary pathology shows that chronic inflammation, histiocytes, etc. are common phenomena in women without SBIs and are observed with fibrocystic changes in breast tissue and in normal wound healing and are not unique to silicone.

"(8) The presence of inflammation, by itself, does not imply that there will be local symptoms and does not indicate systemic disease. The statement that chronic inflammation triggers local symptoms or systemic disease disregards, for example, the high level of chronic inflammation which is the usual condition of the gas-

trointestinal tract. The entire mucosa of the gastrointestinal tract from the stomach to the colon is filled with lymphocytes and plasma cells. This is a normal condition which is, of course, consistent with good health and not indicative of symptoms or disease.

"(9) The claim that chronic inflammation triggers local symptoms or systemic disease also disregards the vast body of literature that has been published about wound healing generally and specifically about wound healing in the breast, regarding women without SBIs. In large part, the breast consists of fatty tissue which undergoes fat necrosis in blunt trauma, at surgery, or biopsy. Resolution of fat necrosis quite clearly may take years and can result in chronic inflammation, scar, histiocytes, angioplasia, calcification, lymphocytes, plasma cells, and granuloma formation (which is frequently found in association with other foreign bodies, such as sutures, that are deliberately left behind from the surgical procedure). The histological reactions to a surgical incision or biopsy are the same as those that occur with the formation of an implant capsule and may persist for several years. To disregard this reaction is to disregard the background against which implant capsule formation occurs. (See photomicrographs labeled as figures A-E attached to this declaration as exhibit 3.) [Not published here.]

"(10) Infiltration of mononuclear cells including macrophages, fibroblasts, mast cells, neutrophils, lymphocytes, eosinophils, and plasma cells may be found in tissue exposed to silicone. However, these reactions are histologically indistinguishable from the reactive changes that characteristically occur in response to fat necrosis

that is found after any surgical procedure on the breast and in women without SBIs. The difference in the histological change in the reaction to fat necrosis and the response to silicone is that the former contains lipid and the latter contains silicone. There is no greater immunologic significance to the reaction to silicone than there is to wound healing with fat necrosis.

"(11) Unrelated to the reaction to blunt trauma or surgical intervention, a variety of fibrocystic changes routinely occur in the breast. The causes of these fibrocystic changes are not known, but they are completely unrelated to silicone. Prominent among these changes are scarring, foamy histocyte production, lymphocytic infiltration, angioplasia, calcification, vasculitis, and plasma cell infiltrates. These changes are seen throughout the breast and therefore cover much more surface area than would be expected from the localized response to a surgical incision. The aggregate surface area of the ductal epithelium of the breast is also much larger and more dispersed than that around a spherical implant. The duration of these changes may be decades.

"(12) The presence of plasma cells, *a marker of inflammation,* in women not exposed to silicone, may be found to fluctuate in the breast in a regular and predictable fashion according to the menstrual cycle:

Vogel, PM, et al., "The Correlation of Histologic Changes in the Human Breast with the Menstrual Cycle," *Am. J. of Pathology* 1981; 104(1):23-34. (Exhibit 4a.)

"(13) A general description of fibrocystic changes is found in:

Page, DL, Anderson, TL, "Miscellaneous Non-neoplastic Conditions," *Diagnostic Pathology of the Breast,*

Churchill Livingston 1992, chapter 6, pp. 62-71. (Exhibit 4b.)

"Other references to the inflammation that can be seen in the breast absent silicone include:

Adair, FE, Munzer, JT, "Fat necrosis of the female breast: Report of One Hundred Ten Cases," *Am. J. of Surg.* 1947; 74:117. (Exhibit 4c.)

Axelsen, RA, Reasbeck, P, "Granulomatous lobular mastitis: report of a case with previously undescribed histopathological abnormalities," *Pathology* (Australia) Oct. 1988; 20(4):383-9. (Exhibit 4d.)

Bassett, LW, Gold, RH, Cove, HC, "Mammographic spectrum of traumatic fat necrosis: The fallibility of 'pathognominic' signs of carcinoma," *Am. J. Roentgenol* 1978; 130:119-122. (Exhibit 4e.)

Bhaskaran, CS, Prasad, KR, Roa, G, Kameshwari, R, Saheb, DA, Aruna, CA. "Chronic granulomatous mastitis: Review of 26 cases with special reference to chronic lobular mastitis," *Indian J. Pathol. Microbiol.* (India) Jan. 1992; 35(1):38-43. (Example 4f.)

Bloodgood, JC, "The blue-domed cyst in chronic cystic mastitis," *JAMA* 1929; 93:1056. (Exhibit 4g.)

Brown, KL, Tang, PH, "Postlactational tumoral granulomatous mastitis: A localized immune phenomenon," *Am. J. Surg.* 1979; 138:326-329. (Exhibit 4h.)

Cohen, I, "Traumatic fat necrosis of the breast," *JAMA* 1923; 80:770. (Exhibit 4i.)

Dabbs, DJ, "Mammary ductal foam cells: Macrophage immunophenotype," *Human Pathology* 1993; 24:977-981. (Exhibit 4j.)

Donn, W, Rebbeck, P, Wilson, C, Gilks, CB, "Idiopathic granulomatous mastitis: a report of three cases

and review of the literature," *Arch. Pathol. Lab. Med.* (United States) Aug. 1994; 118(8):822-5. (Exhibit 4k.)

Fitzgibbons, PL, "Granulomatous mastitis," *N.Y. State J. Med.* 1990; 90:287. (Exhibit 4l.)

Fletcher, A, McGrath, IN, Riddell, RH, Talbot, IC, "Granulomatous mastitis: a report of seven cases," *J. Clin. Pathol.* 1982; 35-941-945. (Exhibit 4m.)

Furlong, AJ, al-Nakib, L, Know, WF, Parry, A, Bundred, NJ, "Periductual inflammation and cigarette smoke," *J. Am. Coll. Surg.,* Oct. 1994; 179(4):417-20. (Exhibit 4n.)

Galea, MH, Robertson, JF, Ellis, IO, Elston, CW, Blarney, RW, "Granulomatous lobular mastitis," *Aust. N. Z. J. Surg.* (Australia) Jul. 1989; 59(7):547-50. (Exhibit 4o.)

Going, JJ, Anderson TJ, Crocker, PR, Levison, DA, "Weddellite calcification in the breast: eighteen cases with implications for breast cancer screening," *Histopathology* 1990; 16:119-24. (Exhibit 4p.)

Going, JJ, Anderson, TJ, Wilkinson, S, Chetty, U, "Granulomatous lobular mastitis," *J. Clin. Pathol.* (England) May 1987; 40(5):535-40. (Exhibit 4q.)

Kessler, E, Wooloch, Y, "Granulomatous mastitis: a lesion clinically simulating carcinoma," *Am. J. Clin. Pathol.* 1972; 58-642-646. (Exhibit 4r.)

Macansh, S, Greenberg, M, Barraclough, B, Pacey, F, "Fine needle aspiration cytology of granulomatous mastitis. Report of a case and review of the literature," *Acta Cytol* (United States) Jan.-Feb. 1990; 34(1):38-42. (Exhibit 4s.)

Meyer, JE, Silverman, P, Gandbhir, L, "Fat necrosis of the breast," *Arch. Surg.* 1978; 113:801-805. (Exhibit 4t.)

Miller, JK, "Plasma cell mastitis: A pathologenic entity," *Am. J. Surg.* 1939; 43:788-793. (Exhibit 4u.)

Parsons, WH, Henthorne, JC, Clark, RL Jr., "Plasma cells mastitis. Report of five additional cases," *Arch. Surg.* 1944; 49:86-90. (Exhibit 4v.)

Peters, F, Schuth, W, "Hyperprolactinemia and Nonpuerperal Mastitis (Duct Ectasia)," *JAMA* (United States) March 17, 1989; 261(11):1618-20. (Exhibit 4w.)

Redden, A, McCrea, ES, Keramati, B, "Inflammatory Breast Disease: Mammographic Spectum," *South Med. J.* Aug. 1988; 81(8):981-4, 988. (Exhibit 4x.)

Rodman, JS, Ingelby, H, "Plasma cell mastitis," *Ann. Surg.* 1939; 109:921. (Exhibit 4y.)

Rytina, ER, Coady, AT, Millis, RR, "Milk granuloma: an unusual appearance in lactational breast tissue," *Histopatology* (England) Nov. 1990; 17(5):466-8. (Exhibit 4z.)

Sloss, PT, Bennett, WA, Clagett, OT, "Incidence in normal breasts of features associated with chronic cystic mastitis," *A.J. Path.* 1957; 33:1181. (Exhibit 4aa.)

Tice, GL, Dockerty, MB, Harrington, SW, "Comedomastitis. A clinical and pathologic study of data in 172 cases," *Surg. Gynecol. Obstet.* 1948; 87:525-540. (Exhibit 4bb.)

Walker, JC, Sandison, AT, "Mammary-duct ectasia: A clinical study," *Br. J. Surg.* 1964; 51:350-355. (Exhibit 4cc.)

Wargotz, ES, Lefkowitz, M, "Granulomatous Angiopanniculitis of the Breast," *Hum. Pathol.* (United States) Nov. 1989; 201(11):1084-8. (Exhibit 4dd.)

"(14) It has been hypothesized that the occasional presence of calcification in breast implant capsules is evi-

dence of an atypical tissue reaction to silicone. However, calcification occurs in the breast absent silicone and obviously can, therefore, be found in some capsular tissue. The following are references to calcification that can be seen in the breast, absent silicone:

Berend, ME, S, DC, Kornguth, PJ, Skinner, CS, Ost, A, Iglehart, JD, Skinner, MA, "The Natural History of Mammographic Calcifications Subjected to Interval Follow-up," *Arch. Surg.* 1992; 127:1309-13. (Exhibit 4ee.)

D'Orsi, CJ, R, FR, Davis, MA, Brown, VJ, "Breast Specimen Microcalcifications: Radiographic Validation and Pathologic-Radiologic Correlation," *Radiology* 1991; 180:397-401. (Ex 4ff.)

Frouge, C, M, M, Guinebretiers, JM, Gilles, R, Vanel, D, Contesso, G, DiPaola, R, Blery, M, "Polyhedral Microcalcifications at Mammography: Histologic Correlation with Calcium Oxalate," *Radiology* 1993; 186:681-4. (Exhibit 4gg.)

Going, JJ, A, TJ, Crocker, PR, Levinson, DA, "Weddellite Calcification in the Breast: Eighteen Cases with Implications for Breast Cancer Screening," *Histopathology,* 1990; 16:119-24. (previously identified as exhibit 4p.)

Orel, SG, Evers, K, Yeh, IT, Troupin, RH, "Radial Scar with Microcalcifications: Radiologic-Pathologic Correlation," *Radiology* 1992; 183:479-82. (Exhibit 4hh.)

Stein, MA, K, MS, "Calcifications in Breast Biopsy Specimens: Discrepancies in Radiologic-Pathologic Identification," *Radiology* 1991; 179:111-4. (Exhibit 4ii.)

Symonds, DA, "Use of the von Kossa Stain in Identifying Occult Calcifications in Breast Biopsies," *Am. J. Clin. Pathol.,* 1990; 94:44-48. (Exhibit 4jj.)

Tornos, C, Silva, E, El-Nagar, A, Pritzker, KPH, "Calcium Oxalate Crystals in Breast Biopsies: The Missing Microcalcifications," *The American Journal of Surgical Pathology* 1990; 14(10):961-968. (Exhibit 4kk.)

Truong, LD, Cartwright, JJ, Alpert, L, "Calcium Oxalate in Breast Lesions Biopsied for Calcification Detected in Screening Mammography: Incidence and Clinical Significance," *Modern Pathology* 1992; 5:146-152. (Exhibit 4ll.)

Winston, JS, Y, IT, Evers, K, Friedman, AK, "Calcium Oxalate is Associated with Benign Breast Tissue. Can We Avoid Biopsy?" *Am. J. Clin. Pathol.,* 1993; 100:488-92. (Exhibit 4mm.)

## II. *Saul Puszkin Ph.D. Hypothesis*

"(15) Saul Puszkin Ph.D. has opined regarding his hypothesis that the nature of the capsule surrounding an SBI is unique or specific to SBIs. In testimony, Dr. Puszkin describes the capsule as a new organ, different from any other typical scar. Dr. Puszkin characterizes a typical scar as that which is found around a pacemaker. According to Dr. Puszkin, the SBI capsule 'has its own life, its own population of cells and its own blood vessels, as its normal constituent of new tissue like new kinds of skin epithelium, internal skin.' (See attached trial transcript of testimony given by Saul Puszkin Ph.D. in the *Barrows* trial, attached as exhibit 2 herein.) [Not published here.]

"(16) Dr. Puszkin's statement that a 'pseudo capsule' which, according to him, is a new organ that is not typical of a foreign body response with its own blood ves-

sels and 'new kinds of skin epithelium, internal skin,' is incorrect. Dr. Puszkin's hypothesis ignores that scarring and associated reaction is seen in the breast with fibrocystic changes and in response to surgery. In both circumstances, there is acute inflammation, chronic inflammation, formation of scar, neo-vascularization (formation of blood vessels), lymphocytic infiltration of tissues and around blood vessels, macrophage infiltration, granuloma formation, and calcification. Other than the coined term 'pseudo capsule' used in Dr. Puszkin's testimony, there are no bases to support the idea that a SBI capsule is not typical of a foreign body response associated with any implant placed in the human body. It is also noteworthy that there is no evidence that skin epithelium occurs in a SBI capsule.

"(17) Macrophage infiltration of the tissues occurs in response to normal material, *i.e.*, breast secretions, found within the ducts of the breast, and also in response to the death of fat and other breast tissues in the breast stroma associated with surgery. During surgery, the surgeon may introduce causes of macrophage infiltration including, but not limited to, cutting into the breast for the purpose of obtaining breast tissue for biopsy or in the process of stopping the bleeding from the surgery during which the surgeon may burn (cauterize) the tissue causing tissue death, sponge the blood from the wound area, leaving behind traces of sponge, or suture the area with cat gut, plastic or silk sutures. Blood also elicits a macrophage-rich reaction in the tissues associated with scarring.

"(18) Healing of the wound following breast surgery of any kind, *e.g.,* biopsy, reduction mammoplasty, or implantation of an implant, results in the formation of a

scar that incorporates all of the elements described above. These include lymphocytes, fibroblasts, macrophages, collagen, new blood vessels, calcium and the 'foreign' material present in the ducts, created from normal adipose tissues or placed there by the surgeon, *e.g.,* sponge or suture material. Both breast secretions and devitalized fat are normal components of the breast which elicit a macrophage-rich or so-called 'foreign body' reaction in the human body.

"(19) The foreign body reaction is histologically similar, whether it is in response to breast secretions, devitalized adipose tissue, suture or sponge material or silicone. When the response is to secretions, the term fibrocystic change is used. When the response is to a healing surgical wound, it is termed fat necrosis. When the response is from a suture, it is a suture granuloma. When the response is to silicone, it is termed capsule or silicone granuloma.

"(20) These naturally occurring changes in the breast cannot be dismissed. The inflammatory nature of the response in the forms of foamy histiocytes (the almost universally observed cell type in the cytologic literature on breast secretions), lymphocytes, plasma cells, fibrosis, calcification, angioplasia, and vasculitis are well documented in the literature, and are readily documented on breast biopsy material that contains no silicone at all. The periductal distribution of this response shows that it involves a large surface area as the branching duct system aborizes throughout the stroma of both breasts. This inflammatory process occurs over many years and is the backdrop against which other inflammatory processes must be judged. Figures F, G, H and I attached as exhibit

1 are photomicrographs of fibrocystic changes of the breast, absent silicone, where chronic inflammation, chronic perivasculitis (formation of new blood vessels), lymphocytic infiltrate, eosinophils and foamy macrophages are evident.

"(21) In sum, there is neither scientific research or any body of data meeting generally accepted scientific standards, nor anything in the histiological presentation of the silicone foreign body response, to support Dr. Puszkin's hypothesis.

### III. *Photomicrographs*

"(22) I have attached as exhibit 3 to this declaration 9 photomicrographs labeled consecutively as figures A through I. None of the attached photomicrographs have silicone present, yet all show reactions which are claimed to be unique to silicone.

"(23) Figures A and B show scar and chronic inflammation from a healing surgical breast wound, absent silicone.

"(24) Figure C shows foamy histiocytes and lymphocytes reacting to devitalized fat, absent silicone.

"(25) Figure D shows a suture granuloma in a healing surgical breast wound of the breast, absent silicone.

"(26) Figure E shows granulomatous inflammation around fat necrosis in a healing surgical breast wound, absent silicone.

"(27) Figures F, G, H and I illustrate some of the cellular reactions seen in fibrocystic change of the breast, absent silicone. Those cellular reactions include foamy macrophages (figures F and I); chronic inflammation

(figure F); scar (figure F); chronic perivasculitis (figures F and H); lymphocytic infiltrate (figure H); and eosinophils (figure I).

## IV. *Conclusion*

"One has to consider the entire context in which silicone may be found in the tissues. Breast tissue, without any surgery, is frequently chronically inflamed, scarred and calcified from fibrocystic changes. Surgery, by itself, introduces foreign materials and devitalizes normal tissue that acts as a foreign body and produces chronic inflammation, scarring and foreign body reaction, which histologically is quite similar to the reaction that one sees following surgical implantation of SBIs.

"In sum, there is neither scientific research nor any body of data meeting generally accepted scientific standards, nor anything in the histological presentation of a silicone foreign body response, to support Dr. Puszkin's hypothesis.

"I declare under penalty of perjury that the foregoing is true and correct.

"Executed on June 1, 2000.

/s/Darryl Carter M.D.
Professor of Pathology
Yale University School of Medicine"

## V. DISCUSSION OF PLAINTIFFS' SCIENCE

At the May 2, 2000 pretrial conference, plaintiffs' counsel identified expert witnesses who would offer testimony that plaintiff's pain is caused, at least partially, by her immune system's localized response to the pres-

ence of the silicone gel. I directed plaintiffs' counsel to have these experts identify the studies upon which they relied through testimony or the filing of supplemental reports. Plaintiffs' counsel was also directed to file a brief with exhibits that included those studies that support plaintiffs' position that there can be a foreign body reaction to the silicone gel that results in adverse clinical and immunological manifestations, including persistent pain.

Thereafter, plaintiffs' counsel filed supplemental expert reports which are discussed at pages 163-65 of this opinion. In addition, plaintiffs' counsel filed a 108-page brief (plaintiffs' brief) that also includes, as appendix A, a 20-page list summarizing approximately 88 studies/reports concerning silicone injections and silicone breast implants, and as appendix B, a 17-page list summarizing studies/reports concerning other silicone implantable devices. The brief was accompanied by 167 studies/reports contained in a seven-volume submission.

At the September 19, 2000 argument/status conference (which was transcribed), defendant's counsel continued to assert that there are no studies which would support expert testimony that silicone causes chest and breast pain (other than any pain attributable to a biological reaction to the implant that is consistent with conventional forms of response to foreign materials). (ST. 23.) According to defendant, none of the studies to which plaintiffs' counsel referred says that "swollen, painful breasts and chronic chest wall pain were caused by the silicone and the chronic foreign body reaction or by the breast implants themselves." (ST. 36.)

When asked if it is defendant's position that the "body does not react to silicone causing pain," counsel responded as follows: "That's correct, it doesn't react any more than it reacts to any other foreign material put in the body." (ST. 22.) It was defendant's position that there is no study which "shows that the silicone can be causing pain." (T. 23).

I asked plaintiffs' counsel to respond to defendant's counsel by identifying a specific study that I might read which would support plaintiffs' position that the body may react to silicone gel to produce pain. Instead, I was referred to the seven volumes of exhibits and a discussion at pages 20-88 of plaintiffs' brief, with emphasis on pages 71-77, and with specific references to two studies: the report of the Independent Review Group, *Silicone Gel Breast Implants* (July 1998), (ST. 25-28), and the report of the Institute of Medicine. (ST. 28-30.) I have included in this opinion the relevant portion of the transcript:

"The Court: Is it your position that there is no study that shows that the silicone can be causing pain?

"Mr. Herrick: That's correct.

"Mr. Schachtman: That's correct, your honor. I'm Nathan Schachtman. If I can qualify something you said about the defendants' position. There is an initial acute reaction to the silicone gel breast implant just as there would be to a pacemaker or an artificial hip or knee.

"The Court: I understand that.

"Mr. Schachtman: That becomes quiescent is not a source of chronic pain in implants of any kind.

"The Court: I understand that's your position.

"Mr. Kopesky: Let me start out then—well, let me turn the court's attention to a couple of things in the defendants' submission.

"The Court: Why don't you just tell me what your studies are. Your position is that there are tons out there that support you. I just need to see them. I need to know what they are and see them.

"Mr. Kopesky: They are cited, your honor, in this document, 'brief of plaintiff, re Admissibility of Scientific Evidence.'

"This was submitted along with—

"The Court: Yes, okay.

"Mr. Kopesky: This was submitted along with seven volumes of exhibits, and at pages 20 through 88 of that brief we discuss the pathology.

"The Court: I want to look at a study. I don't want your discussion. I want to be able to look at studies so I can say, 'Gee, you're right.'

"Mr. Kopesky: In that brief your honor there is a section in there that begins on page 71, 'Chronic and Granulomatous Inflammations.' In the footnotes beginning on page 71 we cite two studies. We refer to them by exhibit number, and they are in the seven volumes of exhibits submitted to the court.

"The Court: Now, this goes from 71 through 77; is that correct?

"Mr. Kopesky: That particular section, yes, your honor.

"The Court: Is there anything else you are relying on other than that?

"Mr. Kopesky: I would cite the court to—this is the supplemental memorandum of law of the defendants in

support of the *Frye* motion. They have exhibit B, which is a collection of materials.

"The Court: I'm not there yet.

"Mr. Kopesky: It was submitted by Mr. Ryan's office.

"The Court: In support of—what is it called?

"Mr. Kopesky: It's the supplemental, memorandum of law of the defendants in support of the *Frye* motion. I have a bound volume with exhibits A through H, your honor.

"The Court: Okay, I have that.

"Mr. Kopesky: Okay.

"The Court: Is that report that you are talking about on the counsel of scientific affairs—

"Mr. Kopesky: What I'm referring to, your honor, is a study that was cited at length in the defendants' brief, and it is the report of the independent review group dated July of 1998.

"The Court: Where is it?

"Mr. Kopesky: If I can approach, your honor?

"The Court: Fine.

"Mr. Kopesky: They aren't separated out. I have mine open.

"The Court: It's part of exhibit B?

"Mr. Kopesky: It's part of exhibit B, and the pages aren't numbered, and it's a collection of articles, and they aren't separated in any fashion. It's about two-thirds of the way back through the exhibit.

"The Court: It is called what?

"Mr. Kopesky: It's called the report of the Independent Review Group. If your honor would care to hand it down, I can find it pretty quickly.

"The Court: Okay, fine. You are saying that supports you?

"Mr. Kopesky: Particularly, section 5.4 of that report which deals with rupture. That report by the Independent Review Group said if there is a spread of gel through the ruptured shell beyond the fibrous capsule—what they call extra capsular spread—the rupture will be more obvious with the change in the shape of the implant, and possibly a reduction of size due to the extrusion of the gel beyond the breast area. In the vast majority of extra capsular ruptures the gel is still in the region of the original pocket and can be removed when the ruptured implant is removed. It indicates in a small number of cases the gel has been found in the breast tissue, the muscle under the breasts, the armpit, the axillary lymph nodes, but rarely in the limbs of the arm and in the depths of the armpit. In some cases this may involve removal of the breast and breast tissue.

"The Court: That doesn't talk about it creating pain; does it?

"Mr. Kopesky: It goes on to indicate that the gel outside the capsule can cause some inflammatory reaction with the development of lumps that can be felt. They are sometimes referred to as silicone granulomas. That's the finding of the Independent Review Group that found no connection between implants and systemic disease, but it did find this significant local injury in rupture situations where the gel escapes the capsule, and if there is no pain and if there is no complication, I would suggest to the court why are they removing muscle tissue, and why are they removing lymph nodes? They are removing it because when the silicone gets into those tissues

you have the foreign body reaction that everyone agrees occurs. You have inflammation. That is how it is characterized in report after report after report. They call it inflammation. When you have inflamed and swollen tissue, you have pain. Hopefully, I don't need to find studies that say that.

"The Court: The reference that your supplemental reports made to a study, what is that study about?

"Mr. Kopesky: I'm sorry, your honor?

"The Court: Your experts reports referred to a study, and I believe it's the Institute of—

"Mr. Kopesky: The Institute of Medicine report.

"The Court: Is that what they are referring to?

"Mr. Kopesky: Yes, your honor.

"The Court: What's that?

"Mr. Kopesky: That's this thing here, judge.

"The Court: Do I have that?

"Mr. Kopesky: Yes, you do, your honor. Bear with me for a moment. In what is characterized as the brief of plaintiff, re: Admissibility of the Scientific Evidence, exhibits, volume 7—

"The Court: That's cited in the pages 71 through 77?

"Mr. Kopesky: No, because the Institute of Medicine report was published after the submission, and I believe it was published after the submission of the 706 Science Panel report. It's a different study by a different group, and it's in our *Frye* brief which is in volume 7 of the exhibits.

"The Court: Which exhibit?

"Mr. Kopesky: Exhibit 167 which is chapter 5 of the IOM report. That is the chapter that deals with reoper-

ations and specific local and perioperative complications. In that report they talk about the local and perioperative complications associated with breast implants. They list some 15 or 20 including acute and chronic breast and chest wall pain, and they discuss each of those local complications; some in more detail than others, and the fact that there are studies and the IOM concludes there are studies to support the fact that they exist.

"The Court: And it is called a reaction; is that right?

"Mr. Kopesky: It is a reaction to the foreign material.

"The Court: To foreign material or the silicone.

"Mr. Kopesky: In this case the silicone is the foreign material, and that's the foreign material being discussed here.

"The Court: Do they discuss it even after removal that they are saying this occurs?

"Mr. Herrick: They say it recedes, your honor; meaning the pain goes down after removal.

"The Court: However, when you say it recedes you are still indicating there is some pain remaining."

## VI. PLAINTIFFS' EXPERT REPORTS

In determining the merits of the controversy, I initially considered the three supplemental expert reports that plaintiffs' counsel filed after the May 2, 2000 conference. These reports are attached as exhibit F (Freundlich), exhibit G (Granick), and exhibit H (Cucin) to the supplemental memorandum of law of defendant, Amitabha Mitra M.D., in support of *Frye* motion (defendant's exhibits).

Dr. Freundlich's report at 1 states: "I also reviewed the Institute of Medicine report which was a neutral panel formed to review the association of silicone breast implants in various health conditions. This panel specifically addressed all of the local injuries suffered by Ms. Toledo. This was a panel convened by Congress and the U.S. Department of Health and Human Services. I also relied on the plaintiff's submission to the 706 Panel pages 42-200 and the studies noted. I relied on these reports as well as a general knowledge, clinical experience and training in formulating my opinion noted below."

Dr. Granick's report at 1 states: "I've reviewed several things in formulating my opinion in the above-captioned matter. Specifically, I relied on the Institute of Medicine of the National Academy of Science and the plaintiff's submission to the 706 Panel pages 42-200 and the studies that they noted. I also reviewed the 706 Panel's findings which indicated that they were solely considering the relationship, if any, between implants and classic connective tissue diseases, such as Systemic Lupus, Sjogren's Syndrome, atypical presentations of connective tissue disease or symptoms of immune system dysfunction.

"The 706 Panel was not charged with evaluating purely local complications of silicone implants.

"The IOM report specifically addressed all of the local injuries suffered by Ms. Toledo. This panel was convened by Congress and the U.S. Department of Health and Human Services."

Dr. Cucin's report at 1 states: "Therefore, since the 706 Panel report did not address the issues relevant to Ms. Toledo's injuries. [sic] In addition to the items noted

above I also relied on the *Report of the Institute of Medicine of the National Academy of Sciences* and the plaintiffs' submission to the 706 Panel pages 42-200. Specifically, Congress asked the U.S. Department of Health and Human Services to sponsor a study of the safety of silicone breast implants by the IOM. There are numerous studies cited in the IOM report, most of which I have reviewed at various times in my career when they first appeared in the literature. In addition, I have reviewed the report by the IOM itself in formulating my opinions in this case."

The witnesses' general reference to the plaintiffs' submission to the 706 Panel, pages 42-200 and the studies noted, is not helpful, because it does not direct me to any specific studies.[7] On the other hand, the witnesses' reliance on the report of the Institute of Medicine addressing local injuries suggests that these witnesses are not contesting the findings of this report.

Therefore, I next reviewed the report of the Institute of Medicine and the report of the 706 Panel to which plaintiffs' experts referred as well as the report of the Independent Review Group upon which plaintiffs' counsel relied at the September 19, 2000 argument.

See pages 159-63 of this opinion.[8]

---

7. According to defendant, pages 20-90 of the brief which plaintiffs submitted to this court are almost identical to plaintiffs' submission to the 706 Panel (pages 42-150). See *e.g.,* corporate defendants' reply to plaintiffs' brief regarding admissibility of scientific evidence at 7-8 and exhibit 2B.

8. Plaintiffs' counsel also relied on the IOM report. See pages 162-63 of this opinion.

## VII. RECENT REPORTS

### A. *Report of Institute of Medicine*

At the request of Congress, the Institute of Medicine (i) carried out a comprehensive evaluation of the evidence for the association of silicone breast implants, both gel and saline filled, with human health conditions, (ii) assembled a comprehensive list of scientific references on this subject, and (iii) considered recommendations for further research. The resulting publication, Institute of Medicine, *Safety of Silicone Breast Implants* (National Academy Press (www.nap.edu) 2000) (IOM report), includes the text of the report (pp. 1-284), reference lists (pp. 285-479), appendix A—brief description of the scientific workshop (pp. 483-87), appendix B—description of the public meeting (pp. 488-504), appendix C—review of the reports of the Independent Review Group and the National Science Panel (pp. 505-14), and appendix D—glossary (pp. 515-24).

The IOM report at 177 will support expert testimony that chest pain is a common complaint, and when it is associated with implants "pain, like sensory change, which is of similar frequency, is not surprising given the damage to the nerves to the breast and nipple during implantation and reconstructive surgery and the routine injury to the nerves . . . during mastectomy."

The IOM report at 148 will support expert testimony of pain associated with capsular contracture: "A foreign body reaction and the formation of a capsule are expected consequences of breast implantation. The contraction of the fibrous connective tissue of their capsule to the point

of discomfort and loss of cosmetic effect is an undesirable but common complication. . . . Contracture may also lead to other interventions that carry risk, such as closed capsulotomies with possible hematoma or rupture, migration of silicone gel and a need for further surgery . . . . The foreign body reaction, formation of a fibrous capsule, and its contracture are likely no more common in breast implants than in other implants, but the soft tissue, cosmetic role of the breast implant means that these reactions or complications have a substantially greater effect on the safety and performance of this implant, as just discussed."

The IOM report at 190-91 will support expert testimony of gel migration and reaction to the gel. "In prolonged tissue exposures, as is the case with silicone breast implants, chronic inflammation seems to be the most relevant process. Accumulations of lymphocytes and monocytes, which later differentiate into macrophages, characterize chronic granulomatous reactions. The tissue reaction to silicone implants appears to be one of granulomatous inflammation.

"The histological appearance of foreign body reactions is not specific for any particular disease process. Silicone granulomas are typical foreign body granulomas which show multinucleated giant cells and aggregates of epithelioid macrophages, surrounded by dense lymphocytic and neutrophil cellular infiltrates. . . . Presumably, the inflammatory cells that enter the tissues do not respond to the foreign material itself but to a surface layer of absorbed, partially denatured plasma proteins for which there are specific receptors on neutrophils and macrophages."

However, the IOM report finds no support for the proposition that there is any relationship between silicone breast implants and any immune related human health conditions, either local or systemic.

In its executive summary, one of the conclusions of the IOM report at 10 was that:

"Studies addressing the immunology of silicones are limited and technical problems substantial, providing the committee with no support for an immunologic role of silicone."

In chapter 6, the IOM report considered the immunology of silicone. It reached the following conclusion at 197:

## "CONCLUSIONS

"Based on the data available, the committee concludes that there is no convincing evidence to support clinically significant immunologic effects of silicone or silicone breast implants. This includes: insufficient evidence for an association of a particular HLA type in women with breast implants and health conditions; insufficient evidence for silicone as a super-antigen; insufficient or flawed evidence that silicone produces immune activation of cells of the immune system, silicone antibodies, delayed type hypersensitivity to silicone, cytokines as an immune response, antigen specific immune cellular infiltrates; and insufficient evidence for autoantibodies or T-cell self antigen activation. The paucity of significant, well controlled studies examining these questions is responsible for these conclusions. The committee finds that there is conclusive evidence that some silicones have adjuvant activity, but there is no evidence that this has any clinical significance. The committee has also con-

cluded that evidence from experimental studies of the immunology of silicone does not support, or lend biologic plausibility to, associations of silicone breast implants with immune related human health conditions."

Also the IOM report at 142 states that the committee "did not find scientific evidence" for the proposition that "changes in the local tissue reaction and possible systemic effects would likely follow an adoptive immunological response in addition to a foreign body or innate response;" and at 194 that "the committee has concluded that evidence that silicone or silicone-modified proteins are antigenic and capable of eliciting an adaptive immune response is insufficient or flawed."

## B. *Report of Independent Review Group*

The Independent Review Group was organized in the United Kingdom by the chief medical officer at the request of the Minister of Health. Its task was to review the evidence relating to the possible health risks associated with silicone gel breast implants. The scope of the investigation was similar to that defined by the statement of task for the IOM report. This project also addressed the full array of associations between breast implants and various diseases and health conditions, including local effects, neurological effects, effects on children, toxicology, cancer, and autoimmune systemic disease. See IOM report, appendix C, at 505-506. The IRG report was available in July 1998.

The IRG report reached the same conclusions as the IOM report.[9] The IRG made the following findings as to

---

9. Exhibit B of defendant's exhibits includes this report at the end, following numerous other articles.

capsular contracture (5.1), infection (5.2), gel bleed (5.3), and rupture (5.4).

"5.1 Capsular contracture

"The body puts a wall of scar tissue (fibrous capsule$^G$) around any implanted foreign material and breast implants are no exception. Scar tissue shrinks, but the extent of shrinkage varies from person to person and even from breast to breast. This shrinkage, or capsular contracture, is noticeable to the woman as an apparent hardening of the breast.

"With the older smooth surface implants (1st and 2nd generation) noticeable capsular contracture occurred in 40 percent to 60 percent of implantations. When implants with a textured surface were introduced in the mid-1980s (3rd generation), the reported rate of capsular contracture fell to around 10 percent with these implants.

"The type of filling used in the implant has not been shown to have any effect on the incidence of contracture. Other factors, such as subclinical haematoma$^G$, shrinkage of the surgical pocket or subclinical infection with organisms such as Staphylococcus epidermidis$^G$, a bacterium normally found on the skin, have also been implicated as possible causes of capsular contracture.

"5.2 Infection

"The IRG considered the published evidence relating to the risk of infection from silicone gel breast implants. It is important to recognise that the introduction into the body of any foreign material such as a hip replacement, intravenous catheter, prosthetic heart valve, or silicone implant constitutes a risk of introduction of bacteria from the patient's own skin.

"The IRG concluded that the possible influence of infection on capsular contracture is not proven. Capsular contracture may, however, be exacerbated by bacterial infection.

"Chronic low grade infection may occur with any surgical implant. Such infection at any site in the body, may be associated with a number of symptoms including tiredness, weakness, intermittent febrile periods and muscle aches and pains. There is a need for more scientific research into this area to determine how frequently low grade infection occurs in women with breast implants and whether this contributes to the symptoms complained of by some women.

"5.3 Gel bleed

*"The term gel bleed describes the diffusion of small molecules of liquid component of silicone gel through the intact shell of the implant.* There is no agreed method of measuring gel bleed and this, therefore, limits its accurate quantification. However, these small molecules of silicone comprise less than one percent of the gel. *Gel bleed occurs from all breast implants; the concern is whether the material that bleeds causes illness.*

"These small molecules are handled by the body in exactly the same way as small silicone molecules from other sources. (See section 3.3.)

"5.4 Rupture

*"Rupture means the development of a split or hole in the shell of a breast implant.* The causes of rupture may include:

—deterioration of the implant shell with time—the most common cause

—undetected damage at the time of operation

—a shell weakness due to flaw introduced during manufacture

—trauma to the breast, such as damage from a seat belt in a traffic accident, or external (closed) capsulotomy<sup>G</sup> (disruption of the fibrous capsule).

*"The effects of a rupture may be local and/or regional. There are reports of silicone gel having migrated to distant parts of the body such as the arm or trunk, but these are rare.*

## *"Local effects of a rupture*

"With a silicone gel filled implant there may be no very dramatic change in the breast because if the shell ruptures, the gel is often still contained within the body's fibrous capsule (intracapsular rupture). There may, however, be some slight change in shape or firmness of the breast.

## *"Regional effects of a rupture*

"If there is a spread of gel through the ruptured shell beyond the fibrous capsule (estracapsular spread), the rupture will be more obvious with a change in the shape of the implant and possibly a reduction in size due to extrusion of gel beyond the breast area.

"In the vast majority of extracapsular ruptures the gel is still in the region of the original pocket and can be removed when the ruptured implant is removed.

"In a small number of cases the gel has been found in breast tissue, the muscles under the breast, the armpit, the axillary lymph nodes<sup>G</sup> in the armpit or rarely around the nerves to the arm (brachial plexus<sup>G</sup>) in the depths of

the armpit. In rare cases this may require removal of part of the breast and muscle tissue.

"Gel outside the capsule can cause some inflammatory reaction with the development of lumps that can be felt. If the gel does move out of the breast area there may have been some severe physical trauma to account for this, such as compression from a seat belt in a car accident or a closed capsulotomy.

### "Detection of a Rupture by Imaging Techniques

"Intracapsular rupture can be difficult or impossible to detect by current imaging techniques (mammography, ultrasound and magnetic resonance imaging). Often it is only discovered at operation. However, these imaging techniques continue to be developed and evaluated. By contrast, extracapsular rupture is often easier to detect by imaging techniques.

### "Rupture Rates

"There is little information on the overall rupture rate of breast implants. Breast implants have a finite life and inevitably some will rupture. There is little information on rupture or the relationship between rupture, time, and indeed, the generation of implant. The available estimates of rupture rates are derived mainly from studies using a highly selected sample of implants. These studies are further complicated by their use of different criteria in defining rupture, for example some include gel bleed within the definition of rupture.

"The difficulties of establishing the rate of rupture are compounded by the use of imaging techniques which in

a percentage of cases fail to detect ruptures or incorrectly identify intact implants as ruptured."

In chapter 6, the IRG report considered the manner in which the body reacts to the silicone gel. It recognized that the body has two basic ways of reacting to foreign materials: inflammation and immune reactions. As to inflammation, the report reached the following conclusions:

*"(1) What pathological responses are associated with the presence of silicones in the tissues?*

"After considering the pathological slides supplied by Professor Shanklin, the IRG concluded that silicone gel breast implants, like other surgical implants, are associated with a typical local inflammatory response to the foreign material and that implants are associated with local fibrosis and the formation of a membrane between the implant and the body.

"The foreign material may occasionally be seen in sites other than the breast, particularly the regional draining lymph nodes. If overt rupture of the implant occurs and the silicone material escapes, clearly the possibility arises that a more substantial amount of silicone could accumulate elsewhere in the body. The extent of gel bleed and the likelihood of rupture depend primarily on factors related to the implant. (See section 5.4.) A local inflammatory response is also likely to occur at the site of silicone accumulation. The consequences of this will depend on the site at which the silicone accumulates and the amount of material present."

At the end of chapter 6, the IRG report concluded that there were no studies which would support a finding of

an immune reaction to the silicone that causes pain or disease.

"(1) There is no histopathological or conclusive immunological evidence for an abnormal immune response to silicone from breast implants in tissue.

"(2) There is no epidemiological evidence for any link between silicone gel breast implants and any established connective tissue disease. If there is a risk of connective tissue disease, it is too small to be quantified. The IRG cannot justify recommending further epidemiological studies to investigate this hypothesis.

"(3) Good evidence for the existence of atypical connective tissue disease or undefined conditions such as 'silicone poisoning' is lacking. It is possible that other conditions, such as low grade chronic infection may account for some of the non-specific illnesses noted in some women with silicone gel breast implants.

"(4) The overall biological response to silicone is consistent with conventional forms of response to foreign materials, rather than an unusual toxic reaction.

"(5) There is no evidence that children of women with breast implants are at increased risk of connective tissue disease.

"(6) The IRG recognised that there were issues such as the precise incidence of rupture where the scientific data were incomplete so that rigorous conclusions could not be drawn."

The findings of the IRG report are generally consistent with the findings of the IOM report. The IOM report at 510 discussed the findings of the IRG report as follows:

"The IRG report also analyzed and discussed systemic effects including immunological and pathological effects, among them inflammation and pathological signs of immune activity such as vasculitis; the presence of substances potentially capable of inciting immune disease such as silica; the prevalence of autoantibodies, antibodies to silicone, and T-cell responses to silica; silicone adjuvant activity; and the correlation of signs and symptoms of health conditions in women with implants with specific HLA (human lymphocyte antigen) types. *The IRG report's findings of the lack of evidence or plausibility for the presence of silica in tissues of women with gel breast implants, the lack of credible evidence for specific silicone antibodies or adaptive immune responses to silica, and the failure to discover reliable biomarkers for a particular silicone associated systemic condition are generally consistent with the committee's views. Existing data do not allow the definite exclusion of systemic or local immune responses associated with silicone breast implants, but no valid scientific evidence currently establishes any such association.* In fact, the nature of science is such that no scientific data can ever allow the definite and unexceptional exclusion of this possibility. The IRG commissioned an independent investigation that came to different conclusions than a report by one U.S. investigator of silica and the diagnosis of vasculitis in tissue of women with silicone implants."

## C. *Report of National Science Panel*

The third report was prepared by the National Science Panel. Its report was available in December 1998.

The 706 Panel was appointed by Federal District Judge Sam C. Pointer Jr., coordinating judge for the federal breast implant multidistrict litigation. Its purpose was to provide the court with an independent assessment of the science at issue in this litigation. The 706 Panel was not asked to consider purely local complications such as breast disfigurement, tenderness, and capsular contracture. It was asked to the extent that it believed appropriate, and without being asked to address separately each of the diseases, symptoms, conditions, and complaints identified in an appendix, the scientific basis, if any, for any claimed linkage. See defendant's exhibit C, order no. 31E. [Not published here.]

The findings of the 706 Panel are not inconsistent with the findings of the IOM report and the IRG report. The IOM report at 511-12 discussed the findings of the 706 Panel as follows:

"The second chapter of the NSP report, 'Clinical Immunology,' *summarizes the clinical evidence for silicone induced immune alterations in women with silicone gel breast implants.* The panel introduced the discussion in this chapter by examining again what it believed to be the weak adjuvant effect, the NK-cell effects, and the effects in animal autoimmune models of some silicones noting that in general, these effects are of uncertain biological significance. The panel then reviewed relevant studies on cytokines, NK-cell function, superantigen activity, HLA types, and T-cell activation in women with silicone breast implants; antinuclear antibodies, specific autoantibodies—including anti-collagen, antimicrosomal, antisilicone, and antipolymer antibodies; and monoclonal gammopathy and multiple myeloma. *The NSP*

*concluded that, overall, the data do not demonstrate adaptive antigenicity of silicone, immune system activation in women with silicone breast implants, or the presence of autoreactivity in women with breast implants. Absent immune system activation, it seems unlikely that there is sufficient local inflammation to account for reported symptoms in women with silicone gel breast implants.* In summary, the panel concluded that there were a number of design flaws in studies of the immune system of women with breast implants and that, at the time its report was published, there were no consistent data supporting the hypothesis that silicone gel breast implants cause an alteration in systemic immune responses in women."

## VIII. REVIEW OF PLAINTIFFS' STUDIES

Obviously, I am not required to accept the conclusions of the IOM report, IRG report, and the 706 Panel. Consequently, I reviewed plaintiffs' brief, appendices A and B, and its 167 exhibits to determine what studies may support the expert testimony that plaintiffs wish to offer that plaintiff's chest and breast pain is related to a localized response to the silicone gel.

None of the 167 exhibits, with the exception of exhibit 167, discusses the relationship between silicone gel and breast and chest pain. Exhibit 167 is a prepublication copy (1999) of chapter 5 of the IOM report. As I previously discussed, while this IOM report concludes, at pages 176-77 (136-37 of the prepublication copy, exhibit 167), that women with breast implants may experience breast and chest pain that may continue after explantation, it also concludes that the pain is not caused

by the body's reaction to silicone gel. See IOM report, chapter 6 at 179-97.

Plaintiffs' brief identifies several studies as supporting plaintiffs' position that there is an immune response to silicone gel that causes pain and other injuries. However, none of the studies do so.

The following statement is made in plaintiffs' brief at 21-22:

"As Dr. Louise Brinton of the National Institutes of Health recently wrote: '[T]here is now recognition that silicone is immunogenic.' Brinton, L.A., Brown, S.L., 'Breast Implants and Cancer,' 89 (18) *Journal of the National Cancer Institute* at 1341-49 (Sept. 17, 1997) (attached as exhibit 2)."[10] [Not published here.]

The conclusions of this *Journal* article, however, are consistent with defendant's position that there is no immune response to the silicone.

The authors justified their study because of the possibility that the chronic inflammation caused by silicone bleeding from the breast implants may act on the immune system, in which event the occurrence of higher rates of breast cancer among women with implants may be observed. See plaintiffs' brief, exhibit 82 at 1342:

10. The review, "Breast Implants and Cancer" to which plaintiffs refer is attached as exhibit 82. The statement at footnote 18 is: "Recent evidence (18), however, has documented that it is immunogenic; the range of repercussions remains to be defined." 89 *J. Nat'l Cancer Inst.* at 1341. Footnote 18 cites Yoshida, "Silicone breast implants: immunotoxic and epidemiological issues," *Life Sci.* 1995:56:1299-310, an article which does not appear as one of plaintiffs' 167 exhibits and is not listed in appendix A.

"The high rate of occurrence of antinuclear antibodies in patients with autoimmune diseases like systemic lupus erythematosus or scleroderma has prompted use of the antinuclear antibody test along with clinical assessments as a diagnostic tool among implant patients *(21)*. However, these antibodies may occur in unaffected women. Claman and Robertson *(22)* reported that the proportion of positive antinuclear antibodies is greater in women with breast implants than in control subjects, but Peters et al. *(5)* reported that implant patients have levels similar to those of age-matched control subjects. The discrepant findings may be explained by the fact that the study by Claman and Robertson *(22)* had a relatively high rate of diagnosed connective tissue diseases and a low prevalence of positive antinuclear antibodies in the nonaugmented control group [0 percent versus 28 percent in the study by Peters et al. *(5)]*. Neither of these studies observed an association between the antinuclear antibody test results and breast implant rupture, but ascertainment of rupture was not complete. Another group of investigators *(23)* observed an increase in anti-collagen autoantibodies in women with breast implants when compared with those in age-matched control women. It has been suggested that silicone may act as an adjuvant, *i.e.,* that it is a depot for antigen, which results in enhanced presentation and inappropriate response to native antigens *(24)*.

"While positive test results have been reported in a number of essays used to assess various aspects of the immune response, the clinical relevance or reproducibility of these results is not clear. For instance, the prolif-

erative response of mononuclear cells stimulated with silicone dioxide has been reported to be enhanced greatly in women with breast implants compared with control subjects without implants *(25)*. False-positive results from tests for cell-mediated immunity to silicone were reported to be a major concern in a blinded study of this test *(26)*. There is little doubt, however, that silicone bleeding from breast implants may cause local inflammation in some women *(27)* and that this inflammation may become chronic, which is of concern because chronic inflammation has been implicated in tumor formation. Other perturbutions to the immune system that might influence the development or progression of cancer are under investigation *(28)*. Given that women with implants have been reported to have diminished natural killer cell activity *(29)*, control of tumor cell growth might also be involved.

"While the extent and the consequences of silicone on the immune system are not known, the evidence that silicone is not inert and may act on the immune system has provoked much interest in the possibility that patients with silicone breast implants have increased rates of connective tissue disorders as well as less defined conditions *(30)*. A recent, large retrospective cohort study of female health professionals *(31)* suggested a small increased risk of connective tissue diseases in women with silicone breast implants, although other prospective studies *(32, 33)* have failed to detect any such increases. The issue of an atypical disorder or syndrome related to silicone breast implants has not been resolved. Recent research *(34)* suggests that human Leukocyte

antigen (HLA) DR53 may be a marker ▮ women with breast implants for susceptibility to development ▮ symptoms that have been likened to fibromyalgia or chronic fatigue syndrome.

"Although most attention has focused on the long-term effects of silicone implants on these connective tissue disorders, ▮ range of complications, suggests that consideration be given ▮ effects on other chronic diseases, most notably cancers that r▮ arise as a result of immunologic disturbances. Furthermore, it is well recognized that implants can interfere with the visualization of breast tumors, leading to concerns that there may be result delays in diagnosing breast cancers. Concern regarding cancer risk in women with implants is further raised by findings that ▮ polyurethane foam cover used to cont▮ some implants has been found to have the potential for releasing 2,4-toluene diamine ▮ demonstrated carcinogen in laboratory animals *(35)*. Thus, ▮ issue of whether silicone breast implants may alter cancer r ▮ certainly warrants serious consideration." (footnotes omitted)

The conclusion of the study was that "[t]here is currently little evidence to support the notion that breast implants increase the risk of subsequent breast cancer." *Id.* at 1347.

Plaintiffs' brief at 23 n.11 contains the following discussion:

"Subacute and chronic inflammation follow a similar progression but the persistence of the foreign material to incite a reaction or the difficulty in antigen processing accounts for a large number of the most persistent

inflammations. Local tissue injury, through subacute or chronic inflammation, constitutes a threat to host survival and can lead to autoimmune reactions. Chronic inflammation seen with silicone breast implants will be discussed in greater depth later in this section of plaintiffs' brief. See William L. Epstein, transcript of MDL 926 Rule 706 National Science Panel at 428 (July 23, 1997). See also, Epstein, W.L., Fukuyama, K., 'Chemically-Induced Granuloma Formation,' *Immunologic Diseases of the Skin,* chapter 45 at 525-35 (1991) (attached as exhibit 4); Epstein, W.L., 'Chemical-Induced Granulomas,' *Dermatology in General Medicine,* chapter 135 at 1590-98 (1987) (attached as exhibit 5); Epstein, W.L., 'Cutaneous Granulomas as a Toxicologic Problem,' *Dermatotoxicology and Pharmacology,* chapter 17 at 465-72 (1977) (attached as exhibit 6); Epstein, W.L., 'Pathogenesis of Granulomatous Inflammation in Skin,' *Dermatology,* chapter 16 at 378-88 (3d ed. 1992) (attached as exhibit 7); Epstein, W.L., 'Cutaneous Granulomas as a Toxicologic Problem,' *Dermatotoxicology,* chapter 27 at 545-53 (2d ed. 1982) (attached as exhibit 8); Epstein, W.L., Fukuyama, K., 'Mechanisms of Granulomatous Inflammation,' *Immune Mechanisms in Cutaneous Disease,* chapter 29 at 687-21 (1989) (attached as exhibit 9). See generally, discussion later in this section of the instant brief." [Exhibits not published here.]

None of the articles referred to in this footnote addresses silicone breast implants or breast/chest pain. These articles consider granulomatous inflammation of the skin, including chemically-induced granulomas and silica granulomas caused by exposure to sand. The ap-

parent purpose of those studies is to assist dermatologists in diagnosis and treatment of skin diseases.

Plaintiffs' brief at 32 cites exhibit 20 (Stark, Gobel and Jaeger, "Intraluminal Cyclosporine A Reduces Capsular Thickness Around Silicone Implants in Rats," 24 *Annuals of Plastic Surgery* 156-61 (1990)), as supporting the statement that "[s]tudies have shown that an immune response to silicone is responsible for the thickening of the capsule." However, this study only involves the placing of silicone tissue expanders in rats. Furthermore, the authors reached only the following conclusions:

"Immunosuppressive general side effects are probably not to be expected. Nonetheless, in breast reconstruction a local immunosuppressive effect has to be cautiously considered with regard to local tumor recurrence.

"Cyclosporine A interferes with the induction of T-helper cells and cytotoxic T cells. This leads to an inhibition of the release of interleukin-1 as well as interleukin-2. Interleukin-1, a fibroblast proliferation factor, can be responsible for an excessive collagen deposition [14]. *In vitro* T-lymphocyte lymphokines stimulate fibroblast migration and replication as well as collagen syntheses [19]. The reduction in capsular thickness in the experiments could be due to the immunosuppressive effect of cyclosporine A by blocking the release of these trophic factors. This would support the immune theory of capsule formation. Whereas Ahonen [1] and Nemlander [11] and their associates did not detect any nonspecific effect of cyclosporine A on wound healing experimentally, a suppression of scar formation was found by Fishel and co-workers [6].

"Whether the diminished collagen capsule deposition is based on the T-cell specific inhibition or a nonspecific action of the drug has to be investigated further. Considering the high morbidity of capsular contracture in breast surgery patients, a controlled clinical trial on the effect of the intraluminal cyclosporine A should be considered." *Id.* at 160. (footnotes omitted)

Plaintiffs' brief at 42 again cites exhibit 20, this time as supporting the statement that the capsule surrounding silicone breast implants is "immune-medicated." As I have already discussed, at the most, the authors of this study say that a reduction in capsular thickness "*could* be due to the immunosuppressive effect of cyclosporine A by blocking the release of these trophic factors [and] [t]his would support the immune theory of capsule formation." *Id.* (emphasis added)

Plaintiffs' brief at 67-68 supports the position that there is an immunological significance to the presence of silicone granulomas by referring to a report by Dr. Nancy Hardt. (Exhibit 144.) Exhibit 144 is a report to the 706 Panel which refers to the types of inflammatory responses that had been described by Dr. Epstein in his testimony (which was apparently favorable to the manufacturers). Dr. Hardt refers to an examination of the tissues of 171 patients with 304 capsules represented. She states that epithelioid histiocytes and formed granulomas were identified in 87 capsules of 56 patients. Thus, she concludes that literature indicating that inflammation is rare in implant related tissues is less than accurate. However, she reached no conclusions as to the immunological significance. She simply stated that it is being overlooked by pathologists.

Plaintiffs' brief at 69-70 refers to a report appearing in the *Journal of the National Cancer Institute* attached as exhibit 145.[11] The report describes a study in which researchers wished to determine the capacity of silicone gels to induce plasmacytomas in mice. The researchers concluded only that:

"The pathogenesis of these tumors is not yet known. In view of the results of this study and reports of the immune system-stimulating effects of silicone gel, the relationship between long term exposure to silicone gel implants and the development of MGUS and myeloma should be examined in appropriately controlled investigations. Further work is required to address the many important unanswered questions in these areas." 24 *J. Nat'l Cancer Inst.* at 1064. (footnote omitted)

Plaintiffs' brief at 82 cites exhibit 53 (Surgitek, "Risks and Benefits of Silicone Gel-Filled Breast Implants: A Summary of Findings in the Literature" (1989)) for the proposition that this internal document from Surgitek acknowledges that the literature shows that histochemical observations are reported in the literature showing that "silicone is capable of eliciting a cellular immune response that can be demonstrated by the migration inhibition technique. This response is comparable to that elicited by purified protein derivative and suggests that silicone may act as a hapten-like incomplete antigen."[12]

---

11. Potter, M., Morrison, S., Wiener, F., "Induction of Plasmacytomas with Silicone Gel in Genetically Susceptible Strains of Mice," 86 (14) *J. Nat'l Cancer Inst.* 1058-65 (1994) (attached as exhibit 145). [Not published here.]

12. Exhibit 53 at 10, citing only Heggers, J.P., "Biocompatability of Silicone Implants," *Annuals of Plastic Surgery*, 11:38-45 (1983). This Heggers article is not one of the exhibits that plaintiffs furnished

This internal document simply describes risks that may be associated with breast implants. It is not a study and it does not purport to identify what studies are and are not generally accepted. In fact, the document at 11 contains the statement that the "incidence of immunological sensitization and autoimmune disease in association with silicone breast implants is not known nor is the exact relationship between the two clearly established."

Plaintiffs' brief at 83 refers to exhibit 120 (Klykken, P.C., Memo re Differentiation of Foreign Body Reactions and Immune Granulomas (1992) as follows:

"Similarly, Dow Corning acknowledged in an internal document that implanted silicone breast implants lead to granulomatous and chronic inflammation, and that the consequence of the specific immune response to silicone resulted in 'severe disruption of immunoregulatory functions . . . .' "

However, the writer of this exhibit 120 reached the following conclusion:

"As the same cell types participate in foreign body reactions and immune granulomas, it is difficult if not impossible to differentiate the two types of granulomas morphologically. Furthermore, it is not always easy to differentiate them clinically unless clear evidence of immunological sensitivity (i.e., memory, lymphocyte dependency, specificity and transferability) is found (E. R. Unanue, In: Textbook of Immunology, Williams and Wilkins, 297-306, 1984). To date, research efforts by Dow Corning scientists (PMAA report references 64,

and is not described in the 20-page appendix A which describes approximately 88 studies.

65, 140, 141, 214 and 215) and university investigators (Brantley et al. Ann. Plast. Surg. 25:44-47, 1990) which have specifically focused an the issue of whether mammary implant materials are immunigenic, have failed to demonstrate any linkage between these implant materials and immunilogical sensitization. Conversely, these data sets are consistent with normal wound healing responses to alloplastic materials."

Plaintiffs' brief at 80-87 describes several studies which, according to plaintiffs, establish that "the cellular reaction seen in silicone-exposed tissue, whether in breast implant capsules, lymph nodes, granulomas, other tissue exposed to free silicone, or in joints with silicone implants—is strikingly similar and is characterized by adverse clinical and immunologic manifestations." Plaintiffs' brief at 87. However, these studies only describe a chronic inflammatory reaction leading to the formation of the granuloma. None of these studies provide a link between the granulomatous responses and pain or disease.

## CONCLUSION

At oral argument, plaintiffs' counsel appeared to make the following argument:

This case does not involve a claim that silicone gel causes disease. Consequently, the findings of the IOM, IRG, and 706 Panel on the issue of the relationship, if any, between silicone gel and disease are irrelevant.

This case involves only testimony that silicone gel causes localized pain. The findings of the IOM, IRG, and 706 Panel that gel outside the capsule may cause

chronic inflammation support the testimony of plaintiffs' expert witnesses that silicone gel causes chronic localized pain because, according to plaintiffs' counsel, inflammation causes pain.

However, the claim that inflammation causes either disease or pain is disputed by defendant. As I have previously discussed, it is defendant's position that the chronic inflammation is not harmful.

Plaintiffs' brief does not refer to any studies that have drawn a distinction between pain and disease. In addition, none of plaintiffs' studies other than the IOM report addresses chest and breast pain unrelated to capsular contracture.

The IOM report does not support plaintiffs' position. It devoted an entire 65-page chapter (chapter 5) to Reoperations and Specific Local and Perioperative Complications. The only pain that it attributes to silicone gel implants is that caused by capsule contracture and that which the surgeries may have caused.

Testimony that silicone gel causes disease or pain is novel scientific evidence, the validity of which is not generally accepted in the scientific community. Thus, I am granting defendant's *Frye* objections to expert testimony that any of plaintiff's injuries or pain are the result of the body's response to silicone gel.

## ORDER

On December 29, 2000, it is ordered that defendant's motion to bar plaintiffs' expert witnesses from offering testimony that any of plaintiff's injuries and pain are the result of the body's response to silicone gel is granted.

Pretrial conference at which a trial date will be set will be held on January 16, 2001 at noon o'clock in courtroom 815 of the City-County Building, Pittsburgh, PA 15219.